

**REDACTED VERSION**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**BID PROTEST**

**FILED**

OCT 1 5 2014

**FILED UNDER SEAL**

U.S. COURT OF
FEDERAL CLAIMS

|  |  |
|---|---|
| SIERRA NEVADA CORPORATION, | ) ) ) |
| Plaintiff, | ) |
| v. | ) ) ) |
| THE UNITED STATES, | ) ) |
| Defendant. | ) ) ) |

Case No. _____

 14 - 994C

Judge ____

**FILED UNDER SEAL**

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Sierra Nevada Corporation ("SNC"), by and through its undersigned counsel, files this complaint for declaratory and injunctive relief, and alleges as follows:

### NATURE OF THE CASE

1.     Plaintiff SNC brings this action to set aside and enjoin the decision by Defendant, the United States, acting by and through the National Aeronautics and Space Administration ("NASA" or "Agency"), to override the mandatory stay issued under the authority of the Competition in Contracting Act ("CICA"), 31 U.S.C. §3553(d)(3)(A).  The stay came into effect when SNC filed a post-award bid protest with the U.S. Government Accountability Office ("GAO") challenging NASA's award of Commercial Crew Transportation Capability ("CCtCap") contracts.   One contract was awarded to The Boeing Company ("Boeing") and the other to Space Exploration Technologies Corporation

1

("SpaceX"). SNC brought its GAO protest on September 26, 2014. Thirteen days later, on October 9, 2014, NASA decided to override the stay, and issued a "Determination" that set forth the Agency's justification for continuing performance of the CCtCap contracts.

**JURISDICTION AND STANDING**

2.      NASA has determined to continue performance of the CCtCap contracts awarded to Boeing and SpaceX notwithstanding the CICA stay. The legal basis for this override also is in CICA, at 31 U.S.C. § 3553(c)(2)(A) and (B).

3.      This Court has subject matter jurisdiction under 28 U.S.C. §1491(b)(1) to review NASA's override of the automatic stay. *RAMCOR Servs. Group, Inc. v. United States,* 185 F.3d 1286, 1288-89 (Fed. Cir. 1999); *Nortel Government Solutions, Inc. v. United States,* 84 Fed. Cl. 243, 247 (Fed. Cl. 2008).

4.      The remedies that SNC seek are authorized by the Tucker Act, 28 U.S.C. §1491(b)(1), and by the Declaratory Judgment Act, 28 U.S.C. §§2201-02.

**PARTIES**

5.      Plaintiff SNC, 1722 Boxelder Street, Louisville, Colorado 80027, is one of three companies that competed for the CCtCap contracts.

6.      Defendant is the United States of America, acting by and through NASA.

**FACTUAL BACKGROUND**

7.      The International Space Station (ISS) was developed and has been supported by an international partnership of nations, including the United States, Russia, Canada, ten member countries of the European Space Agency, and Japan. The U.S. alone has expended about $75 billion on the development and support of the ISS over 30 years. The

2

United States and Russia are the largest contributors to the project. The ISS has been crewed since November 2000.

8.      Between December 1998 and July 2011, NASA used U.S. Space Shuttles to fly missions to the ISS. (A gap of 2-1/2 years followed the loss of the Space Shuttle Columbia on February 1, 2003.) On January 14, 2004, President Bush announced that NASA would retire the three remaining space shuttles after assembly of the ISS was completed in 2010. The last U.S. Shuttle flight to the ISS launched on July 8, 2011. Since then, all eleven spaceflights to the ISS have been in the Russian Soyuz spacecraft. All have included a U.S. astronaut. U.S. astronauts first flew on a Soyuz to the ISS in March of 1995. Since 2003, U.S. astronauts have flown on 31 of 33 Soyuz missions to the ISS. There have been approximately 40 crewed Soyuz expeditions to the ISS since October 31, 2000, transporting approximately fifty (50) U.S. personnel and fifty-eight (58) Russian personnel.

A.      **The Commercial Crew Program**

9.      NASA's Commercial Crew Program ("CCP") serves to develop a U.S. commercial crew transportation capability with the goal of achieving safe, reliable and cost-effective access to and from the ISS. Once a transportation capability is certified to meet NASA's demanding requirements, NASA intends to use the provider to fly missions to meet NASA's ISS crew and support obligations.

10.     SNC participated in previous phases of NASA's CCP and entered into several Space Act Agreements with NASA: (a) a $20 million Space Act Agreement for Commercial Crew Development (CCDev1) (2010-2011); (b) $80 million Space Act Agreement for Commercial Crew Development Round 2 (CCDev2) (2011-2013) (subsequently increased to

.354670.1354670.2

$105.6 million); (c) $227.5 million Space Act Agreement for Commercial Crew Integrated Capability (CCiCap) (2012 –2015). Space Act Agreements are not subject to the Federal Acquisition Regulation (FAR).

11.    In 2013, NASA awarded SNC a $10 million Certification Products Contract (CPC) for development of certification plans for safe, crewed missions to the ISS, with a performance period of 2013-2014. The CPC is a contracting action under the FAR and constitutes Phase 1 of the CCtCap element of the CCP. Phase 1 has been completed. Phase 2 of CCtCap is the FAR procurement that precipitated SNC's protest and this action.

12.    Over the course of the Commercial Crew Program, NASA reports that it has awarded more than $8.2 billion in Space Act Agreements and contracts. The largest contracts, which are those protested by SNC, are the CCtCap contracts to Boeing and to SpaceX with maximum contract values of $4.2 billion and $2.6 billion, respectively.

13.    All previous U.S. human spaceflight systems, including the Space Shuttle, were designed, owned and operated by NASA, and the Agency was responsible for overall development. The CCP, in contrast, is a public-private partnership. The industry partner is responsible for developing its own spaceflight system, which it will own and operate, inclusive of the orbital vehicle that will carry crew to and return to Earth from the ISS as well as for the rocket system that will boost the orbital vehicle into orbit. NASA is responsible for certifying the systems to ensure they are safe for human spaceflight and safe to operate in proximity to the ISS. NASA has never before qualified or certified a privately developed crewed spacecraft.

4

14. The two companies that received CCtCap awards, Boeing and SpaceX, both use "capsule" designs to carry crew to the ISS and to return to Earth. Boeing uses an existing and proven rocket, a variation of the Atlas-V to launch its capsule. SpaceX uses a rocket of its own design and manufacture, an enhanced version of its Falcon 9. SNC uses a reusable winged lifting body to carry crew, and also uses a variation of the well-proven Atlas-V as its launch vehicle. All industry partners are expected to invest their own resources to contribute to development.

**B.    The CCtCap Solicitation and Award**

15. The protested CCtCap consists of activities, awarded as CLIN 001, necessary for design, development, test and evaluation ("DDT&E") and full certification of a crew transportation system for the ISS mission and at least one crewed flight test. NASA's certification means that the contractor's system has met NASA's safety requirements for transporting crew to the ISS. Under CLIN 002 of the CCtCap contracts, NASA may order "Post Certification Missions" (PCMs) to the ISS. The contract guarantees a minimum of two PCMs and allows for a maximum of six. PCMs will be ordered as fixed-price tasks on an Indefinite Delivery/Indefinite Quantity basis.

16. Ten months elapsed between issuance of the CCtCap RFP and the selection decision. NASA issued the CCtCap solicitation on November 19, 2013, and amended it in December 2013 and April 2014. Award was to be made on a best value basis, considering three defined evaluation factors: Mission Suitability, Past Performance and Price.

17. NASA received CCtCap proposals from Boeing, SNC and SpaceX. All responded by the due date of January 22, 2014. NASA found all three offerors to be

5

responsible, compliant and eligible for award, and all were determined to be within the competitive range.

18. Discussions were conducted with each offeror between April 21, 2014 and June 27, 2014. Final proposal revisions were received on July 7, 2014. The Source Selection decision was announced more than two months later, on September 15, 2014. Each of Boeing and SpaceX were selected for award. On September 16, 2014, SNC received notice of the awards and of its non-selection for an award.

## C. SNC's Bid Protest and Subsequent NASA Override

19. After NASA debriefed SNC on September 19, 2014, SNC filed a timely protest to the contract awards to Boeing and SpaceX at the GAO on September 26, 2014. Among other grounds, SNC protested that the Source Selection Statement reflects a selection decision that diverges from the solicitation's evaluation criteria.

20. Upon receiving SNC's timely protest, GAO notified NASA of the protest which triggered the stay of performance of the CCtCap contracts awarded to Boeing and SpaceX. Thirteen days later, on October 9, 2014, NASA executed a "Determination to Continue Performance of Commercial Crew Transportation Capability (CCtCap) Contracts After Receipt of Government Accountability Office (GAO) Protest" (the "Override Memo").

21. The Override Memo stated that NASA would issue notices to proceed to Boeing and SpaceX, and that NASA would notify GAO of its determination. The Override Memo was signed by William P. McNally, NASA's Assistant Administrator of Procurement, and William H. Gerstenmaier, NASA's Associate Administrator, Human Exploration and Operations Mission Directorate. Mr. Gerstenmaier also was the Source Selection Authority

6

(SSA) who signed the Source Selection Statement. On October 10, 2014, NASA provided the Override Memo to SNC, Boeing, and SpaceX.

### D.   NASA's Override Memorandum

22.   The Override Memo contains three sections. Section I ("Need for a U.S. Crew Transportation Capability and the CCtCap Contracts") sets forth the statutory authorization for U.S. contributions to the ISS, NASA's use of contracts with Russia for transportation to the ISS via the Soyuz vehicle, and the background and purposes of the CCtCap solicitation. NASA argues that the U.S. needs to have its own crew transportation and rescue capability "as soon as possible." Override Memo, at 1.

23.   Section II ("Continued Performance of the CCtCap Contracts Is in the Government's Best Interests") presents NASA's justification for the override. The argument is that "[c]ontinued performance of the CCtCap contract is critical to ensure the safety of the ISS crew, the operation of the ISS, and to meet international obligations." Override Memo, at 6.

24.   Section III (the "Determination" ) states, first, that "it is in the best interests of the United States to continue performance of the CCtCap contracts" and then that "urgent and compelling circumstances exist that will significantly and adversely affect the interests of the U.S. unless the agency authorizes contract performance, notwithstanding the protest." Override Memo, at 14.

25.   CICA provides an automatic stay of a contract award after filing of a GAO protest. As concerns a post-award protest, such as that filed by SNC at the GAO, the head of a procuring activity may override the stay upon a written finding that:

(1)  performance of the contract is in the best interests of the United States; or

(2)  urgent and compelling circumstances that significantly affect interests of
the United States will not permit waiting for the decision of the
Comptroller General concerning the protest.

31 U.S.C. § 3553(c)(2)(A)-(B).

26.    NASA asserts that the override is in the best interests of the United States.

Section II of the Override Memo proceeds to articulate NASA's reasoning in four

subsections:

"Consideration of Significant Consequences Adverse to the Interests of
the United States" (pages 7-11);

"Consideration of Reasonable Alternatives" (pages 11-12);

"Cost Considerations" (pages 12-13); and

"Impact on Competition and the Integrity of the Procurement System"
(pages 13-14).

These section headings correspond to the criteria elaborated in *Reilly's Wholesale Produce v.*

*United States,* 73 Fed. Cl. 705 (Fed. Cl. 2006).

## SIERRA NEVADA CORPORATION'S ALLEGATIONS

### A.     NASA Has Not Shown that the Override is in the "Best Interests of the United States"

27.    NASA's decision to override the automatic stay comes 13 days after the filing

of SNC's GAO protest and thus would eliminate the stay for 87 days (as of the date of the

Override) or such shorter time as GAO may need to resolve the protest on its merits.

354670.1354670.2

28.     Congress designed CICA's automatic stay as a competition enforcing

mechanism. It reflects an important Congressional purpose that the GAO should be able to

resolve bid protests free of the potential influence that funds are being spent on performance

of protested contracts. While exceptions are provided, any override is contrary to the

ordinary operation of CICA. Accordingly, jurisprudence has developed by which this court

has jurisdiction to hear challenges to an override. The Court reviews an agency's decision to

override under the standard of review provided by the Administrative Procedure Act (APA),

5 U.S.C. §§ 701-706.

29.     Review under the APA standard is to determine whether an agency's action is

arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

Deference is accorded agency actions, but it is limited. The Supreme Court has held that an

agency's decision must be based upon a consideration of "relevant factors" and a reviewing

court may consider whether there is a "clear error in judgment."

30.     In the *Reilly's Wholesale Produce v. United States,* 73 Fed. Cl. 705 (Fed. Cl.

2006) case, this Court articulated four factors that had developed in the caselaw to guide and

inform its APA review of the override there challenged. NASA's Override Memorandum

adopts this framework. The factors are:

> (i)     whether significant adverse consequences will
>         necessarily occur if the stay is not overridden;
>
> (ii)    conversely, whether reasonable alternatives to the
>         override exist that would adequately address the
>         circumstances presented;

.354670.1354670.2

(iii)     how the potential cost of proceeding with the override,
          including the costs associated with the potential that the
          GAO might sustain the protest, compare to the benefits
          associated with the approach being considered for
          addressing the agency's needs; and

(iv)      the impact of the override on competition and the
          integrity of the procurement system, as reflected in the
          Competition in Contracting Act.

*Reilly's,* 73 Fed. Cl. at 711 (citations and footnotes omitted).

31.    CICA presumes that it is in the government's best interest to stay contract

performance pending resolution of timely GAO protests; thus, the stay is "automatic." As

such, the typical deference accorded agency decision-making in contract matters is muted by

Congress's countervailing presumption, embodied in CICA, that the GAO bid protest

mechanism provides and important benefit to the federal procurement process.

32.    NASA has failed to demonstrate that it is in the "best interests of the United

States" to proceed without the CICA stay and has not shown the necessary "urgent and

compelling circumstances" to override the stay. NASA's override therefore constitutes an

action that is arbitrary and capricious, and an abuse of discretion.

**B.    Stayed Performance of the CCtCap Contract Will Not Jeopardize Crew
        Safety, the Operation of the ISS or Meeting International Obligations**

33.    NASA recognizes the ambitious, if not unprecedented, nature of the CCP

program. It states that "[i]t takes several years from the time a launch service is ordered until

the launch vehicle and spacecraft are produced, integrated, and certified as safe and ready for

launch." Override Memo, at 5. Even then, "[m]issions under the CCtCap contract must be

ordered Redacted          in advance, in addition to the time required to certify vehicles to a

10

point where missions may be ordered." Override Memo, at 7. The DDT&E for the CCtCap vehicles is just beginning and development "takes many years." Override Memo, at 4. The new U.S. vehicles will not be certified before 2017 *even if* each program runs true to present schedule notwithstanding the many programmatic risks that NASA acknowledges are prevalent on development programs such as this one. Override Memo at 4, 5, 7, 10.

34.     These considerations – all drawn from NASA's Override Memorandum – establish that NASA cannot reasonably commit now to the future CCtCap vehicles for flights after 2017. They are not yet developed, tested or certified. The only prudent course for NASA, now, is to use the statutory authority it has to obtain additional flights using the Russian Soyuz vehicle so that it covers the at-risk period after 2017 and before CCtCap spacecraft can be employed once they are certified as safe for flight and available for these missions. NASA knows this – but chose not to admit the point in the Override Memorandum.

35.     The Override Memorandum states that NASA must order seats on the Soyuz vehicle three years in advance. *Id.* at 7, 8. And it states that NASA does not now have contractual coverage for Soyuz flights after 2017. Override Memo, at 2, 6, 11. Contrary to the impression that NASA hopes to convey, in fact NASA already recognizes – *and has told Congress* – that it plans to purchase more flights from Russia on Soyuz exactly because it will not have U.S. crewed capability ready before the end of 2017.

36.     On March 27, 2014, NASA Administrator Charles Bolden testified before Congress on the Agency's FY 2015 budget. His prepared statement, made to the House Committee on Science, Space And Technology, Subcommittee On Space, contains the following statement:

11

> "Later this year, we'll move beyond commercial cargo and
> award contracts to American companies to send astronauts to
> the station from American soil and end our sole reliance on
> Russia. If Congress fully funds our Fiscal Year 2015 request, I
> believe we can do this by the end of 2017. Unfortunately, due to
> the reduced funding the past few years for the president's
> Launch From America plan, **NASA may need to extend our
> current contract with the Russians and purchase more seats
> on the Soyuz spacecraft**."

Testimony of Charles Bolden, NASA Administrator, House Committee on Science, Space

and Technology; Hearing on NASA Budget for F.Y. 2015 (March 28, 2014) (emphasis

added). (It bears note that Congress has never viewed the service date for CCtCap with the

same "criticality" as suggested by NASA in the Override Memorandum, as Congress has

never funded any of the prior CCP Space Act Act Agreements anywhere near the President's

budget request. In 2012 and 2013, Congress provided $300 million less, each year, than the

Administration's request – even though NASA asserted that less than full funding would

delay commercial crew service entry.

37.    Although it is nowhere mentioned in the Override Memorandum, in fact

NASA's current fiscal year budget informs Congress that NASA intends to continue to use

the Soyuz vehicle to support crewed missions to the ISS:

> "The Russian Space Agency, Roscosmos, currently provides
> ISS crew transportation. NASA plans to continue purchasing
> crew transportation services from Roscosmos until a domestic
> capability is available."

National Aeronautics and Space Administration, FY 2015 President's Budget Request

Summary (ISS Crew and Cargo Transportation), at SO-25 (emphasis added).

38.    To support the ISS during 2018, and until it has a basis to rely upon new U.S.

spacecraft, NASA knows both that it can and that it likely will order seats on Soyuz flights.

It has said so to Congress and its budgetary plans reflect this assumption. NASA's rationale

12

for the Override turns on a premise that the Agency can support the ISS after 2017 only by having the new CCiTCap vehicles ready for crewed missions and for this reason that the Agency has no "reasonable alternative" other than proceeding with performance of the CCitCap contracts. Override Memo, at 2, 11. NASA knows that this is not correct. The failure of this premise serves to invalidate NASA's attempt to bypass the CICA stay and frustrate the GAO bid protest process.

39.    In light of NASA's announced plans to continue to purchase Soyuz flights "until a domestic capability is available," its efforts to attribute decisive urgency to the first 100 days of the CCtCap DDT&E is contradicted by the Agency's own budgetary actions and Congressional commitments. NASA asserts that the CCtCap contracts "represent the only source of U.S. crew transportation to and from the ISS, and rescue capability, reasonably available in the needed timeframe," and that "this critical capability is essential to the continued safe operation of the ISS ...and [to] live up to the United States' international agreements and obligations." *Id.* Override Memo, at 14. These contentions mislead and overreach. NASA knows, in fact, that it will continue to rely upon Russia for transportation of crew to the ISS until the new commercial vehicles are certified as safe and ready for flight

        a.  NASA has relied upon Russia for transportation of U.S. crew to the ISS since 2003. Thirty-five Americans have successfully flown to the ISS in a Soyuz during that time and NASA has contracted with Russia for continued crew transportation through 2017. NASA can and in fact expects to extend this contract, according to Administrator Bolden's FY 2015 budget testimony. Even the Override Memorandum admits that it

13

"may become necessary" if the U.S. does not have another capability. Override Memo at 11. NASA recognizes that U.S. statutes permit use of space transportation service from a non-U.S. source, such as Russia, where a waiver is approved. *Id.*

b. Russia has not refused to agree to more crew missions to ISS in the event that U.S. capability is not ready by the end of 2017. NASA may be able to add necessary flights by modification to the existing contract with Russia. It has done so many times in the past, including the addition of Soyuz flights during the periods after the Space Shuttle program was shut down following flight accidents.

c. NASA has partnered with Russia since the inception of the ISS to carry much of the enormous investment to build and sustain it. Russia has flown more crew to the ISS than has NASA and has used the Soyuz exclusively for all crew transportation since 2010. At several places, NASA now warns of the risk of a "single point of failure" that is associated with Soyuz. Override Memo, at 3, 6, 7, 9. But NASA has accommodated that risk since the retirement of the Space Shuttle and every Soyuz has successfully returned the crew to Earth.

40.     NASA's acknowledges that human spaceflight programs "inherently are very complex and risky," that development, production and testing of launch systems and spacecraft "historically has taken longer than anticipated" and that ensuring the vehicles are safe for human flight "adds additional time and complexity." Override Memo, at 3. In the

14

CCtCap Source Selection Statement, NASA discusses specifically the particular schedule risks that it identifies to each of the three competitors. Yet, NASA contends that its ability to timely take crew to the ISS will be in jeopardy if performance is stayed for 87 days at the outset of DDT&E. The import it attaches to this delay cannot be reconciled to objective evidence, or to NASA's own plans as communicated to Congress. Achievement of operational capability in 2017 was a goal **but not** a *requirement* of the CCtCap Phase 2 RFP. Even though all three proposers offered initial mission capability sometime in 2017, the demanding technical content of these new spacecraft development programs makes every proposed commercial crew provider subject to significant risk of delay. NASA acknowledges as much. Override Memo, at 3, 6, 7.

41. Thus, NASA establishes: (1) new spacecraft development is highly prone to delay; (2) it must order Soyuz seats at least three years in advance (and add time to negotiate contract terms); and (3) it has only contracted with Russia for Soyuz seats through 2017. To reasonably ensure crew transportation service to the ISS beyond 2017, NASA must soon place orders for seats on Soyuz flights to the ISS after 2017. Merely *days* into the CCtCap contracts, it is facially unreasonable for NASA to claim that it can plan or commit to crewed missions after 2017 using either the Boeing or SpaceX crew transportation systems, when that assumes "strict" schedule compliance that is contrary to NASA's repeated experience, and when NASA cannot be sure when or even whether either vehicle will pass flight certification. The Commercial Crew Program is at least as demanding as NASA's commercial cargo program, if not much more so. None of the current NASA commercial

15

cargo services providers (SpaceX and Orbital Sciences) maintained their proposed and awarded schedules, both being several years late.

42.    Moreover, NASA bears some responsibility for the situation in which it now finds itself. The Commercial Crew Program did not start until 2010. This was at about the same time as the Space Shuttle ended service, though the decision to retire the Shuttle had been announced in 2004. Further, on CCtCap, NASA took ten months from receipt of proposals to announce its selection decision. Had it believed that every day was as critical as it now contends, NASA could have abbreviated its lengthy acquisition and evaluation process.

C.    **Application of the *Reilly's* Factors**

1.    **NASA Has Not Shown Sufficient "Adverse Consequences" to Justify the Stay**

43.    At pages 7-11, the Override Memo discusses "Consideration of Significant Consequences Adverse to the Interests of the United States." NASA alleges that interrupting the performance of the CCtCap contracts pending the outcome of the GAO protest will significantly impact the nation's ability to have ISS crew transportation after 2017. Override Memo at 8. According to NASA, this is due to two principal reasons.

a.    First, NASA contends that the United States and all ISS partner countries depend exclusively on Russia's Soyuz spacecraft for manned service to the ISS, resulting in a single point of failure for the continuous availability of ISS flights. Override Memo at 9. NASA has not contracted for Soyuz flights beyond 2017. NASA alleges that prolonging this dependence jeopardizes our country's compliance with international agreements for

16

emergency ISS rescue operations and crew rotations, and for manning the ISS. *Id.*

b. Second, NASA contends that in the U.S., it takes several years to progress a launch service from the time of order to when the vehicle is certified as safe and ready to launch. NASA contends that because the CCtCap contracts begin with the critical path activity of Certification Baseline Review (CBR), delay in performing this work will prevent Boeing and SpaceX from meeting the contracts' other scheduled milestones. *Id.* at 10.

44.    Notwithstanding its lengthy exposition, the harms claimed by NASA are speculative and remote, and NASA unreasonably inflates the supposed harm that it will suffer by reason of the stay. As explained above, NASA's insistence that it can avoid further use of the Russian Soyuz vehicle after 2017, only by override of the stay, rings hollow. NASA already plans to purchase more Soyuz flights and it knows that the risks of new vehicle development and safe flight certification are too high to rely upon availability of the new CCtCap spacecraft for 2018.

45.    If there are no "adverse consequences" from the stay, or if they are only speculative, the agency's case is necessarily weakened that the "best interests *of the United States*" are served by the override. (Emphasis added.) It may be expedient for NASA to avoid the stay, but the laws of the United States include CICA, of which the stay is an important feature.

46.    As explained, NASA has successfully relied upon Russia's Soyuz vehicle as the single source for ISS crew transport for many years. Since it actually plans to add more

17

Soyuz flights, the Agency cannot reasonably attach such momentous significance to an 87-day period at the beginning of the lengthy, expensive and complex CCtCap program. Many causes contribute to present U.S. reliance upon Russian spacecraft, including NASA's own decision-making. NASA has avoided any gap in its ability to support its obligations to international partners for crew transportation to the ISS by use of the Soyuz over the years and it plans to continue to purchase Soyuz flights until domestic capability is available.

47. Early program activities do not have the dispositive importance that NASA suggests; indeed, NASA admits that "the first ISS mission cannot be authorized until after the Certification Baseline Review (CBR) *and additional specified milestones have been successfully completed.* Override Memo at 8 (emphasis added). But NASA asserts that all other CCtCap work flows from the critical CBR and that delay in performing this work "means the contractors will not meet the rest of the scheduled milestones that result in certification." *Id.* This too overstates the significance of the CBR. Certification of the vehicles will require expenditure of billions of dollars and take several years of effort. The CBR is the first of several financial milestones and is just one of many performance waypoints in this program of great complexity and cost.

48. Even if the CBR is delayed, this does not establish that NASA (or its contractors) will lack the means to recover the lost time through a replan or selective acceleration of other project actions. NASA says that a "massive effort will be necessary to expedite activities after the resolution of the protest to meet the 2017 schedule" (Override Memo at 10), but it offers little detail to support this assertion. Moreover, NASA surely was

18

aware of the possibility that its CCtCap decision would produce a protest, so the 100-day

GAO stay could not have come as a "surprise."

### 2. The Override is Not Justified by Absence of Reasonable Alternatives

49.     At pages 11-12, the Override Memo addresses NASA's "Consideration of

Reasonable Alternatives." NASA contends that it has considered all possible alternatives to

proceeding with the CCtCap contracts, and has dismissed them all as unreasonable. Override

Memo, at 11. NASA notes that this is not a situation where an existing contract with an

incumbent can be extended. *Id.* The Orion Multi-Purpose Crew Vehicle currently being

developed for deep-space exploration missions is designed to serve as back-up crew transport

to the ISS, but that vehicle will not be operational for human missions until 2021. *Id.*

50.     As to procuring additional ISS crew transportation services from Russia,

NASA asserts that this option "is uncertain and is not a reasonable alternative" to meet ISS

crew transportation needs after 2017. *Id.* NASA contends that procuring additional Soyuz

service is not in the best interests of the United States because it is contrary to United States

law and space policy. *Id.* NASA maintains that procuring astronaut seats on the Soyuz is

only authorized under the Commercial Space Act of 1998 when there is no domestic

capability, which would not be the case if service were available under the CCtCap contracts.

*Id.* Likewise, NASA cites U.S. policy stated in NASA's Authorization Act of 2010, which

allows reliance on non-U.S. spacecraft only when United States-owned and operated human

space flight capability is not available. *Id.*

51.     Upon examination, however, NASA did not fully consider or reasonably

characterize the possible alternatives. If NASA cannot plan or rely upon certified CCtCap

19

vehicles before the end of 2017, it has the alternative of procuring crew transportation services from Russia. It has acknowledged as much. *Id.* While NASA states that this is an "uncertain" and "not a reasonable alternative," in fact NASA admits to the legal mechanism to obtain a waiver as may be required – for reasons having nothing to do with the stay or override – if U.S. capability is not available for needed crew missions after 2017. *Id.* What NASA describes now as "not a reasonable alternative" seems at odds with the Agency's exclusive reliance for upon Russia for ISS crew transportation since 2011 and its FY 2015 budget plans that anticipate a need to extend the contract with Russia and purchase more seats on the Soyuz.

52.     NASA incorrectly implies that the U.S. alone has legal or operational responsibility to keep the ISS in operation, and that without U.S. crew delivery capability by 2017 the ISS will be unsupported. This fails to account for the massive contribution that Russia has made to the construction and operation of the ISS from inception, the fact that Russia has had one or more cosmonauts on the ISS continuously since inception, and that Russia has sent more cosmonauts to the ISS than the U.S. has sent astronauts. All of these considerations, not to mention NASA's FY 2015 budget plans and testimony, weigh in favor of treating additional Soyuz flights after 2017 as a "possible alternative" if the U.S. CCtCap vehicles are not ready.

### 3.     The Override Could Prove Very Costly But Not Beneficial to NASA

53.     At pages 12-13, the Override Memo discusses NASA's analysis of "Cost Considerations." NASA alleges that under the CCtCap contracts the government's costs are managed because NASA is only obligated to pay each contractor upon the contractor's

20

successful completion of certain technical work delineated in contract milestones. Override Memo at 13. NASA contends that if its override decision prevails and GAO were to sustain SNC's protest, the contracts' Limitation of Funds clause would limit the government's liability to the $129.3 million NASA has obligated on each contract. *Id.*

54. NASA states that it has considered the costs of continuing to pay for seats on Soyuz voyages in the event that the CCtCap contracts do not continue. NASA maintains that seats on the Soyuz cost the United States approximately $76.3 million each, and that NASA is obligated to pay for both its own astronauts and for its international partners' astronauts. *Id.*

55. NASA alleges that it has considered the programmatic costs of an adverse GAO decision that compels NASA to restart the competition, and incur significant program delay. While acknowledging the negative schedule consequence of such a result, NASA maintains that on balance the adverse cost consequences of its override decision is outweighed by the benefit of proceeding with the contracts and avoiding the negative consequence of holding the contracts in abeyance pending resolution of the GAO protests. *Id.*

56. NASA's Override Memorandum, in fact, establishes that the costs of the override could be *very* costly and without corresponding benefit should GAO sustain the protest, or should NASA be persuaded to take corrective action. The GAO outcome could lead to the cancellation of one or both of the awarded contracts. NASA has described the work that both contractors will do, in the first 90 days, as inclusive of expensive commitments, including acquisition of capital equipment and long lead purchases. Override

21

Memo at 9. This means that the putative awardees, *unless their performance is stayed*, will spend or commit to great sums of money much or all of which will forfeit its value if SNC's protest is sustained. (The expenditures also show the great competitive advantage that the awardees will realize by getting this work underway if the stay does not remain in place.)

57.   NASA cites the Limitation of Funds cap of $129.3 million on funds currently obligated to each CCtCap contract. Override Memo at 13. Should it be necessary to cancel both the Boeing and SpaceX contracts, as could occur if the GAO sustains SNC's protest, then the override will cost the agency as much as $258.6 million. Against this huge amount at risk, NASA's case for the benefits gained by the stay, the conjectural "savings" of 87 days of a multi-year program, do not compare favorably.

58.   Nor is NASA able to rescue its "Costs Considerations" argument by citing the benefits the U.S. will realize by foregoing the stay and permitting Boeing and SpaceX to continue to perform their contracts while the GAO protest is pending. NASA claims that the benefits are that "[p]roceeding with the CCtCap contracts will ensure that the United States has reliable crew transportation when needed for its own astronauts and its international partners." *Id.* at 12. But this goes too far. The relationship between earlier accomplishment of CBR, the first program milestone, and actual achievement of crew vehicle safety certification and flight readiness is far too attenuated to warrant credit to this claim.

59.   SNC believes that cost considerations, in fact, weigh in its favor. Should GAO sustain SNC's protest, this may mean that SNC replaces one of the present two awardees. SNC's offering was $900 million below that of Boeing. SNC's offering provides NASA

354670.1354670.2

with superior operational flexibility and reliability. The "best interests" of the United States are served by letting the GAO protest run its course, with the stay in place as CICA intends.

### 4.    Competition Will Be Harmed if the Override is Sustained

60.    At pages 13-14, the Override Memo presents NASA's analysis of the override's "Impact on Competition and the Integrity of the Procurement System." NASA contends that its override decision honors the congressional purpose of avoiding significant adverse consequences if a contract is suspended. *Id.* NASA alleges that on balance the best interests of the United States are served because the benefits of contract performance outweigh the impact on the procurement process and the consequences of the stay override. *Id.* at 13-14.

61.    NASA acknowledges that some may believe that its override decision gives the awardees an upper hand in a re-competition if SNC prevails on the merits before the GAO. *Id.* at 14. NASA asserts that proceeding with performance will not eliminate SNC's opportunity to compete for award should GAO recommend corrective action. *Id.*

62.    Despite the lip service to CICA's purposes, NASA is essentially indifferent to the effect of the override upon competition. NASA describes the initial post-award work on the CCtCap contracts as follows:

> Critical activities under the CCtCap contracts for the first 100 days include detailed mission integration planning, development of software, development of qualification data, capital equipment and long-lead purchases, and baselines for the ground and on-orbit infrastructure to support processing of launch vehicles, spacecraft, flight operations, and launch pad operations.

Override Memo, at 9. This impressive list is *prima facie* demonstration of the harm to competition if the override is sustained and the GAO rules favorably on SNC's protest. In

23

addition, the awardees will be able to hire critical employees and lock in arrangements with specialized vendors. They are expected to secure launch slots for future year test flights. **Every one of the functions will give a material advantage to SNC's competitors should the GAO determine that any form of re-competition is required that will be all but impossible for SNC to overcome.**

63.     The CBR milestone comes within the first 100 days and is accompanied by substantial payments to both awardees. NASA expects Boeing and SpaceX to perform various design and development tasks and to make long-lead and capital expenditure commitments. *See id.* at 10. If the override is sustained, SNC's two rivals will gain a total of 100 days of funded work by which they also become better informed about how to meet the CCtCap program objectives. By making capital expenditures and long lead commitments, SNC's competitors will have secured supply chain advantages that SNC will be very hard pressed to duplicate. Should SNC's competitors tie up available launch slots during the first 100 days of their performance, this allocation will be very difficult because available slots are very limited.

64.     NASA explains that its "liability is limited to the fixed price milestone amounts" and further that its "financial liability, even in the event of contract termination, is limited by the contracts' Limitation of Funds clause to the amount of funding currently obligated on the contracts." *Id.* at 13. At $129.3 million each, that is a sizable sum of potential liability for the first 100 days of performance (including the 87 days which remain of the stay as of the date of the override).

24

65.     Should the GAO then sustain the protest and recommend a new competition, the work done by the putative awardees during the interval will put them at an enormous competitive advantage vis-à-vis SNC. That advantage will persist even if SNC prevails in the protest and displaces one of the current awardees. Eventually, under CLIN 002 of CCtCap, missions will be ordered via ID/IQ vehicles. The awardee that had the 100-day funded advantage may realize undeserved benefits that skew the future PCM mission competition.

### D.    "Urgent and Compelling Circumstances" Are Not Present to Justify the Override

66.     The Override Memo concludes that "urgent and compelling circumstances exist that will significantly and adversely affect the interests of the U.S. unless the agency authorizes contract performance, notwithstanding the protest." Override Memo at 14. The GAO process contemplates a decision within 100 days of the filing of the protest. On the present schedule, the GAO decision on SNC's protest will be issued on or before January 5, 2015. NASA waited 13 days before making and communicating the override decision.

67.     Both CCtCap awardees, Boeing and SpaceX, have substantial and challenging work to accomplish before they achieve safe flight certification and are deemed ready to fly a crewed services mission to the ISS. It is unreasonable for NASA to determine, today, that the 87 days it will save, by an override taken on October 9, 2014, will make any difference in the actual date that either Boeing or SpaceX can safely transport crew to and from the ISS. Indeed, SNC believes that its vehicle may have better results in keeping to schedule than either of its competitors.

25

68.     The Override Memo recognizes that development and qualification of a new space vehicle for human spaceflight is especially challenging:

> Even with successful missions, human spaceflight vehicle production, operations and launches inherently are very complex and risky activities. Development, production, and testing of launch systems takes many years, and historically has taken longer than anticipated. Ensuring these vehicles are safe for human flight adds additional time and complexity.

Override Memo, at 3. Nothing in the Override Memo establishes that saving 87 days, through the override, will erase these risks. Should they occur, as NASA admits is likely as a matter of historical experience, the 87 days at issue now will be subsumed within downstream program delay.

69.     The Override Memo emphasizes that the contracts require completion of a "baseline" review, the CBR, within the first 90 days of contract performance. While this is a significant event – which provides fiscal and technical benefits to the two awardees, unless stayed – it is one of many critical milestones on the CCtCap Program Plan. Override Memo at 8. Before Final Certification Review, years removed from the CBR, billions of dollars are to be spent and tens of thousands of man hours of effort will be expended. *No* crewed missions can be ordered under CLIN 002 until *all* milestones are satisfied. Thus, NASA's assertion of "urgency" is exaggerated and fails to sustain the CICA override.

70.     An agency may override a stay if there are "urgent *and* compelling circumstances that significantly affect interests of the United States." 31 U.S.C. § 3553(d)(3)(C)(ii) (emphasis added). For this justification to be used, NASA must show both "urgency" and that the circumstances are "compelling." A cause that truly is urgent – a

26

condition not present here – is *not* compelling where its costs are greatly disproportionate to the value of the benefit.

71. As discussed above, there is exposure to costs as high as $258.6 million should the GAO sustain SNC's protest and require termination of one or both of the existing awards. Where termination might be followed by an award to SNC but not to one of either Boeing or SpaceX, the monies expended for the excluded contractor would be wasted.

72. SNC expended great effort and resources to prepare and support its CCtCap proposal. It believes its CCtCap vehicle offers unique and important ways for NASA to reduce program risks and realize operational advantages that neither of the two awardees, both using capsules, can achieve. Moreover, SNC has promised to make substantial additional private investment in its vehicle, both for crew and cargo purposes, if it is awarded a CCtCap contract. SNC will be gravely prejudiced if the override is sustained because Boeing and SpaceX will receive significant funding and will do technical work that will give them a grossly unfair and potentially insurmountable head start should a new proposal be required or a new competition required.

73. CICA's purpose is to promote "full and fair competition." That important statutory purpose will be offended if the override is allowed to stand.

## CLAIMS FOR RELIEF

### COUNT I: Unlawful Override of CICA Stay

1. SNC incorporates by reference all the preceding paragraphs.

2. NASA's decision to override the CICA stay on the CCtCap awards to Boeing and SpaceX is arbitrary, capricious, and not in accordance with law.

27

3.     SNC has suffered injury and will continue to suffer injury because of the Government's arbitrary, capricious, and unlawful decision to override the stay of performance on the CCtCap contracts. SNC has no adequate remedy at law for this injury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff SNC prays that this Court grant the following relief:

1.     Enter a declaratory judgment holding that NASA's decision to override the CICA-mandated stay on the CCtCap contracts to Boeing and SpaceX is arbitrary, capricious, or otherwise not in accordance with law, setting it aside, and reinstating the CICA stay on the CCtCap contract;

2.     Issue a temporary restraining order prohibiting NASA from overriding the CICA stay of performance of the CCtCap contracts to Boeing and SpaceX or otherwise permitting Boeing or SpaceX to commence or continue performing the contract;

3.     Issue a preliminary injunction prohibiting NASA from overriding the CICA stay of performance of the CCtCap contracts to Boeing or SpaceX or otherwise permitting Boeing or SpaceX to commence or continue performing the contract, until such time as the Court enters a final judgment on the merits of this action or the GAO has ruled on or otherwise resolved SNC's GAO bid protest;

4.     Issue a permanent injunction prohibiting NASA from overriding the CICA stay of performance of the CCtCap contracts to Boeing and SpaceX or otherwise permitting Boeing or SpaceX to commence or continue performing the contract, until such time as GAO has ruled on or otherwise resolved SNC's bid protest;

5.     Award SNC its costs, including reasonable attorneys' fees and expenses;

.354670.1354670.2

29

6.  Grant SNC such other relief as the Court deems just and proper.

DATED:      October 15, 2014        Respectfully submitted,

Neil H. O'Donnell
Dennis J. Callahan

**ROGERS JOSEPH O'DONNELL, P.C.**
750 Ninth Street, N.W., Suite 710
Washington, D.C. 20001
(202) 777-8950 (telephone)
(202) 347-8429 (facsimile)
Counsel for Sierra Nevada Corporation

.354670.1354670.2

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

## BID PROTEST

|  |  |
|---|---|
| SIERRA NEVADA CORPORATION, | ) |
| Plaintiff, | ) Case No. _____ |
| v. | ) Judge _____ |
| THE UNITED STATES, | ) |
| Defendant. | ) |

## CERTIFICATE OF SERVICE

I hereby certify that I have caused to be delivered, by hand, facsimile, or electronic means, on this 15th day of October, 2014, copies of (1) the Complaint, (2) Plaintiff's Application for a Temporary Restraining Order, (3) Proposed Temporary Restraining Order, (4) Motion for a Preliminary Judgment and Injunction Relief, (5) Proposed Order Granting Preliminary Injunction, (6) Proposed Order Granting Declaratory Judgment (7) Memorandum in Support of Plaintiff's Application for a Temporary Restraining Order and Motion for a Preliminary Injunction, (8) Plaintiff's Corporate Disclosure Statement, and (9) Plaintiff's Motion For Leave To File Documents Under Seal and Motion For A Protective Order on the following counsel:

A.    For the United States, the Dept. of Justice Commercial Litigation Branch;

B.    For the contracting agency, NASA, Karen M. Reilley;

C.  For awardee SpaceX, Rick Vacura; and

D.  For awardee Boeing, Scott McCaleb.

Dated: October 15, 2014                    Respectfully submitted,

By: _____
Neil H. O'Donnell
Dennis J. Callahan

ROGERS JOSEPH O'DONNELL, P.C.
750 Ninth Street NW, Suite 710
Washington, DC 20001
Tel:  (202) 777-8950
Fax:  (202) 347-8429

Counsels for Plaintiff Sierra Nevada
Corporation